**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SAMUEL VILLEGAS LOPEZ,
   *Plaintiff-Appellant,*

v.

JANICE K BREWER, Governor of
Arizona; CHARLES L. RYAN,
Director, Arizona Department of
Corrections; RON CREDIO, Warden,
Arizona Department of
Corrections-Eyman; LANCE R.
HETMER, named as: Lance
Hetmer/Warden, Arizona
Department of Corrections-
Florence; UNKNOWN PARTIES,
named as: IV Team Leader; IV
Team Members 1-5; Special
Operations Team Leader; Special
Operations Team Recorder;
Special Operations Team Members
1-5; and Does 1-25,
   *Defendants-Appellees.*

No. 12-16084

D.C. No.
2:12-cv-00245-
NVW

OPINION

Appeal from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

Argued and Submitted
May 14, 2012—San Francisco, California

Filed May 15, 2012

5573

Before: M. Margaret McKeown, Marsha S. Berzon, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge McKeown;
Partial Concurrence and Partial Dissent by Judge Berzon

**COUNSEL**

Dale A. Baich, Robin C. Konrad, Cary S. Sandman, and Jon M. Sands, Federal Public Defender's Office, Phoenix, Arizona; Amanda R. Conley, David Sepanik, and Flora Vigo, O'Melveny & Myers LLP, San Francisco, California; Denise I. Yong, Tucson, Arizona; Kelley J. Henry and Henry A. Martin, Federal Public Defender's Office, Nashville, Tennessee, for the plaintiff-appellant.

Kent Ernest Cattani, Thomas C. Horne, and Jeffrey A. Zick, Arizona Attorney General's Office, Phoenix, Arizona, for the defendants-appellees.

**OPINION**

McKEOWN, Circuit Judge:

We embark upon this opinion with deja vu, the feeling that we have been here before, but with the knowledge that we will likely be here again. We have entertained, usually at the last minute, a number of challenges to Arizona's execution protocol. No court has determined the constitutionality of Arizona's current death penalty protocol, adopted in January 2012, yet we have been asked to address individual provisions of the protocol in the abstract, without a constitutionally firm base. Further complicating our task, in certain respects, the actual procedures followed during individual executions have not been consistent; instead, in the intervening two months since we issued *Towery v. Brewer*, 672 F.3d 650 (9th Cir.

2012), there is uncertainty as to how the next execution will be carried out. The State continues to cling to its discretion, all the while urging us—during oral argument in the waning hours before execution—to trust that it will exercise its discretion in a constitutionally permissible manner. The State's insistence "on amending its execution protocol on an ad hoc basis—through add-on practices, trial court representations and acknowledgments, and last minute written amendments—leav[es] the courts with a rolling protocol that forces us to engage with serious constitutional questions and complicated factual issues in the waning hours before executions." *Id.* at 653. Review of death penalty cases is a grim and difficult undertaking, even without these complications.

## BACKGROUND

Arizona death-row inmates Robert Charles Towery, Robert Henry Moormann, Pete Rovogich, Thomas Arnold Kemp, Milo McCormick Stanley, and Samuel Villegas Lopez brought this action under 42 U.S.C. § 1983, asserting that the Arizona Department of Corrections' (the "ADC") execution protocol violates the Eighth Amendment.[1] Lopez, one of the named plaintiffs with an impending execution date, moved the district court for a preliminary injunction against the ADC's use of its current lethal injection protocol. The district court denied relief and Lopez appealed. We affirm.

In *Towery v. Brewer*, we considered an almost equivalent challenge to Arizona's current execution protocol by another named plaintiff in this case. In light of the extensive prior opinions, we will not repeat the chronology and background. *See id.* at 654-55; *see also Dickens v. Brewer*, 631 F.3d 1139 (9th Cir. 2011). Lopez's challenge, in effect, picks up where *Towery* left off.[2]

---

[1]Some of the named plaintiffs have since been executed.

[2]The State has advised that it will use a one-drug protocol in Lopez's execution. Lopez does not explicitly argue that the protocol is, in itself, unconstitutional. To the extent he indirectly makes this claim, it fails because he provides insufficient evidence to support such a claim.

In the district court, Lopez alleged that: 1) the ADC's medical procedures for inserting IV catheters in condemned prisoners violates his Eighth Amendment rights; 2) the ADC's January 25, 2012, amendment to Department Order 710 (the "2012 Protocol") violates his right to equal protection under the Fourteenth Amendment; and 3) the ADC's execution protocol violates his rights of access to counsel and the courts.

Lopez moved for a preliminary injunction to enjoin his execution to allow for litigation of these claims. The district court considered the evidence in the record and, without holding an evidentiary hearing, denied the request for a preliminary injunction.

The district court held that Lopez had not presented a substantial likelihood of success on the merits regarding his claim that the 2012 Protocol facially violates the Eighth Amendment. Lopez claimed that the ADC's actions surrounding the insertion of IV catheters in condemned prisoners demonstrates an objectively intolerable risk of harm, even where a one-drug protocol is used instead of a three-drug protocol. The district court held that the mere presence of pain and discomfort resulting from the placement of IV lines did not constitute "an objectively intolerable risk of harm" and that some pain was an inescapable consequence of death.

Lopez also claimed that the 2012 Protocol violates his right to equal protection because each of the prisoners executed since the adoption of the Protocol has been treated differently with respect to IV placement and that these variances affected the risk of pain to which each was subjected. Because individualized and changing factors may impact IV placement and because use of a femoral catheter is no more likely to create a risk of cruel and unusual punishment than the use of a peripheral catheter, the district court concluded that Lopez failed to raise serious questions on the merits of his equal protection claim.

Finally, the district court upheld the prohibition on in-person non-contact visitation with the condemned's attorney after 7:00 a.m. on the day of the scheduled execution. It found the prohibition proper because communication with counsel by telephone is still permitted past 7:00 a.m. The district also determined that Lopez is not entitled to have counsel observe the IV-placement procedure.

## ANALYSIS

On appeal, Lopez challenges four aspects of the district court's denial of the preliminary injunction: 1) application of the "serious questions" test; 2) the conclusion that the 2012 Protocol does not violate Lopez's Eighth Amendment rights; 3) the conclusions regarding the ADC's restrictions on in-person non-contact counsel visits; and 4) the decision not to hold an evidentiary hearing. We review this denial of a preliminary injunction for abuse of discretion. *Lands Council v. McNair*, 537 F.3d 981, 986 (9th Cir. 2008) (en banc). An abuse of discretion will be found if the district court based its decision "on an erroneous legal standard or clearly erroneous findings of fact." *Id.* We note that in this appeal Lopez did not advance the argument offered by the dissent, namely a due process challenge based on unfettered discretion and transparency.

## I. PRELIMINARY INJUNCTION STANDARD

**[1]** The district court appropriately articulated the legal principles governing the grant of a preliminary injunction and applied these principles to the limited facts presented by Lopez. A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted). To obtain preliminary injunctive relief, Lopez must demonstrate that: 1) he is likely to succeed on the merits of such a claim; 2) he is likely to suffer irrepara-

ble harm in the absence of preliminary relief; 3) the balance of equities tips in his favor; and 4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As we emphasized in *Towery,* these principles apply even in the context of an impending execution. 672 F.3d at 657 (citing *Hill v. McDonough*, 547 U.S. 573, 583-84 (2006)).

**[2]** Under the "serious questions" variation of the test, a preliminary injunction is proper if there are serious questions going to the merits; there is a likelihood of irreparable injury to the plaintiff; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). The elements of the preliminary injunction test must be balanced, so that a stronger showing of one element may offset a weaker showing of another. " '[S]erious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135.

**[3]** Lopez takes issue with the district court's analysis, arguing that the court failed to balance the four *Winter* factors and did not consider whether Lopez presented serious questions going to the merits of the claims. The district court, however, articulated the *Winter* standard and discussed each of the elements. Although the court's discussion of irreparable harm, the balance of equities, and the public interest is brief, the court did engage with each of these three factors, and thus did not apply an incorrect legal standard. *See United States v. Hinkson*, 585 F.3d 1247, 1261-62 (9th Cir. 2009) (en banc) (a court abuses its discretion if it fails to identify and apply the correct legal rule).

**[4]** To the extent Lopez argues that the "serious questions going to the merits" consideration is a separate and indepen-

dent analysis from the court's assessment of Lopez's likelihood of success on the merits, Lopez misunderstands our precedent. *See M.R. v. Dreyfus*, 663 F.3d 1100, 1108 (9th Cir. 2011) (articulating preliminary injunction standard in terms of likelihood of success on the merits or serious questions going to the merits). Because the district court did not err in determining that Lopez failed to demonstrate a likelihood of success on the merits, it follows that Lopez also failed to raise serious questions going to the merits.

## II.   EIGHTH AMENDMENT CLAIM—PLACEMENT OF IV LINES

**[5]** The Eighth Amendment to the Constitution prohibits the infliction of "cruel and unusual punishments," not punishment itself. Part of Lopez's ultimate punishment—a sentence of death—is the execution process itself. Lopez challenges Arizona's procedures for conducting executions, specifically the placement of the IV lines, claiming that they present an intolerable risk of harm rendering the process unconstitutional.

**[6]** To prevail on an Eighth Amendment claim "there must be a substantial risk of serious harm, an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment." *Baze v. Rees*, 553 U.S. 35, 50 (2009) (quotation marks omitted). Lopez's argument that the ADC is not "subjectively blameless" for its actions is insufficient; instead, the appropriate benchmark is whether the ADC's procedures create "an objectively intolerable risk of harm" that precludes a finding that the prison officials were subjectively blameless. In other words, "[s]imply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of objectively intolerable risk of harm that qualifies as cruel and unusual." *Id.*

Towery's recent execution is the primary basis of Lopez's claim. During the execution, which started at 9:52 a.m., the

ADC spent approximately thirty minutes, and made at least six punctures, unsuccessfully attempting to place IV catheters in both of Towery's arms near his elbows. The ADC's records document that "[a]fter multiple attempts of the left and right peripheral — (approximately 4 in right — 2 in left), IV Team Leader recommended right femoral as primary and left peripheral as back-up." According to attorney testimony, "[d]uring Mr. Towery's last words, he also said that he should have gone left and he went right. He went right when he should have gone left. He then went on to say he made 'mistake, after mistake after mistake.' Based on my discussions with Mr. Towery, this phrase meant that there were problems or he was hurt during the insertion of the catheters."

At this point, the Director of the ADC called the Arizona Attorney General's Office to "provide[ ] an update regarding the IV process." The Team Leader's recommendation was then attempted, and the "[r]ight femoral was successful; left peripheral was unsuccessful." After further discussion between the Director and the Team Leader, the "[r]ight hand peripheral" was chosen as the back-up catheter site. This attempt was successful at 10:59 a.m., approximately an hour after the process began.

Lopez claims that this sequence of events, along with other recent executions conducted by the ADC, demonstrate that he may be subjected to an unconstitutional level of pain during his execution. The district court held that "Lopez has not cited any legal authority or alleged any facts that bring into question the prior conclusion in *West* that the Eighth Amendment is not offended by administration of lethal chemicals through a femoral central line. Nor is there any persuasive or even colorable reason to think that placement of a peripheral IV line in a prisoner's hand, while possibly more uncomfortable than other peripheral sites, poses an objectively intolerable risk of severe pain that qualifies as cruel and unusual." In addition, "[w]hile undoubtedly disquieting to a condemned inmate awaiting execution, repeated efforts to set IV lines do not, in

and of themselves, suggest malevolence from Defendants, extreme pain, or even unnecessary pain."

**[7]** We acknowledge, as demonstrated by the evidence, that there can be some pain and discomfort associated with the placement of IV lines and that, depending on the individual, such placement can be difficult from time to time. An inmate might also experience some pain from the administration of the lethal drugs through a relatively smaller vein. The relevant inquiry, however, is whether placement of the peripheral line in the hand, the femoral catheter, and the series of abortive IV placement attempts, either individually or in combination, lead to an objectively intolerable risk of pain. Lopez has not documented that they do. The record does not support, with any likelihood, the conclusion that the pain Towery purportedly suffered establishes an "objectively intolerable" risk of pain for Lopez, as required under the Eighth Amendment. *See Baze*, 553 U.S. at 50. Our sister circuits have taken a similar view. *See Raby v. Livingston*, 600 F.3d 552, 558-61 (5th Cir. 2010) (upholding Texas lethal injection protocol where evidence of problems with inserting IVs); *Cooey v. Strickland*, 589 F.3d 210, 217-18, 224, 233-34 (6th Cir. 2009) (upholding Ohio protocol despite evidence of problems inserting IV); *Emmett v. Johnson*, 532 F.3d 291, 303, 306-08 (4th Cir. 2008) (upholding Virginia protocol despite problems with IV lines).

**[8]** At this stage, we credit Lopez's characterization of the Towery execution, as the State offered nothing to the contrary. The somewhat increased pain suffered by Towery attendant to his execution was therefore a single, isolated incident, which "alone does not give rise to an Eighth Amendment violation, precisely because such an event, while regrettable, does not suggest cruelty, or that the procedure at issue gives rise to a 'substantial risk of serious harm.' " *Baze*, 553 U.S. at 50 (citation omitted).[3] The isolated nature is underscored by

---

[3]Lopez also challenges the pain related to puncture of the femoral artery and vein. Assuming that puncture of the femoral artery or arterial adminis-

the fact that both Moormann's and Kemp's executions were completed without similar difficulties. Because Lopez does not demonstrate a likelihood of success on the merits, the district court did not abuse its discretion.

[9] Lopez next argues that the increased pain is avoidable if qualified individuals are hired to place the IVs.[4] The Director admitted in December 2011 that "he conducted the last five executions with full knowledge that at least one of the Medical Team members did not hold a medical license and did not administer IVs in his current employment." *West v. Brewer*, No. CV-11-1409-PHX-NVW, 2011 WL 6724628, at *6 (D. Ariz. Dec. 21, 2011). Our decision in *Towery* explained that the 2012 Protocol, as amended by the State's representation and commitments to this court, addresses this issue. The state represented, and we accepted, that " 'relevant experience,' as used in Paragraph 1.2.5.1 of the 2012 Protocol, means that IV Team members must have no less than the training that is traditionally given for people to be *licensed* to place IVs. We view this representation as a binding one that cabins the meaning of 'appropriately trained' and 'relevant experience' in the context of the 2012 Protocol." *Id.* at 658 (emphasis added). We reaffirm this holding, and note also that the ADC committed during oral argument that trained professionals, in this case a licensed physician and nurse, constitute the IV Team for Lopez's execution.

[10] Nonetheless, Arizona's actions come perilously close to losing safe-harbor protection under *Baze*. The 2012 Proto-

---

tration of the lethal drugs leads to pain, Lopez has not demonstrated that the increased pain meets the *Baze* standard, either in isolation or in combination with the other issues discussed here.

[4]This challenge is limited to the personnel the Director might hire to insert the peripheral IV lines. Under the 2012 Protocol, a medically-licensed physician must insert the femoral central line. 2012 Protocol, Attach. D, § E.1 ("In no event shall a femoral central line be used without being done by a medically-licensed physician.").

col does not provide for any time-limit with respect to the siting of IV lines, whereas the protocol blessed in *Baze* had a one-hour time limit. *Compare* 2012 Protocol, Attach. D, § E, *with Baze*, 553 U.S. at 45. This limitation was tested with the siting of Towery's IV lines, which took almost an hour. Although this isolated circumstance does not, in itself, create a serious question going to the merits, the inability of the class of condemned prisoners to procure details about the execution process is troubling. This lack of access is compounded by the State's touting of the public nature of the execution, while concurrently curtailing transparency by shrouding the IV-siting process in a cloak of secrecy.

**[11]** Recent exercises of the Director's discretion give us further cause for concern. For example, detailed execution logs have given way to vague generalities about the execution. The "Continuous Correctional Log" related to West's execution provides minute-by-minute detail regarding the insertion of the IV lines.[5] In contrast, the log for Towery's execution simply concludes, for a 36-minute time period, that "[a]fter multiple attempts of the left and right peripheral — (approximately 4 in right — 2 in left), IV Team Leader recommended right femoral as primary and left peripheral as back-up." And, when questioned about the Director's exercise of his discretion, the State's basic argument boils down to a conclusory statement that the Director is presumed to exercise his discretion in a constitutionally permissible manner. While the State correctly claims the Director may order that an execution attempt be aborted, it cannot explain what circumstances, if any, would trigger such an order. Although we uphold the district court's decision, we caution, yet again, that

---

[5]With respect to insertion of the lines, the log states: "Medical Team leader determined there is significant risk of adverse effects if the vein is defective. A central line was deemed necessary as a backup method to ensure the safest administration of the chemicals." Five minutes later, the log reports that the left arm IV placement attempt failed due to "poor veins," and that the right arm was designated as the primary line.

Arizona's ad hoc approach risks going beyond *Baze*'s safe harbor. *Towery*, 672 F.3d at 653.

## A. EQUAL PROTECTION CLAIM—DISPARATE TREATMENT

Lopez's equal protection claim is that Arizona treats inmates differently and that such differences result in unconstitutional disparate treatment. As we noted in *Towery*, the state's decision as to how to administer the chemicals "may well depend on individualized and changing factors such as the availability of particular people to participate in the execution, the supply of drugs available to the State at a given time, and the condition of the prisoner's veins." *Id.* at 661. For the same reasons that a similar claim failed in *Towery*, the district court held that it fails here as well.

The district court noted that at the time of our decision in *Towery*, the ADC had utilized either peripheral or femoral (or both) IV lines in carrying out each of the previous 26 executions by lethal injection. The district court found that the use of a femoral catheter is no more likely to create a risk of cruel and unusual punishment than the use of a peripheral catheter and held that Lopez had not raised serious questions or shown a likelihood of success on the merits of his equal protection claim.

**[12]** Lopez points to our language in *Towery* to argue that an equal protection claim exists because he has shown "an actual pattern of treating prisoners differently in ways that did affect the *risk* of pain to which they would be subjected, and therefore the *risk* of being subjected to cruel and unusual punishment." 672 F.3d at 660 (discussing *In re Ohio Execution Protocol Litig*, ___ F. Supp. 2d ___, 2012 WL 84548, at *9 (S.D. Ohio Jan. 11, 2012), *motion to vacate stay denied*, ___ F.3d ___, 2012 WL 118322, at *1 (6th Cir. Jan. 13, 2012)). This statement cannot be extracted from its context. The most significant part of the discussion preceded that statement: namely that a prisoner's right to be free of cruel and unusual

punishment "is not affected simply because that prisoner is treated less favorably than another, where one means of execution is no more likely to create a risk of cruel and unusual punishment than the other, and both are constitutionally available." *Id.*[6]

**[13]** Since each condemned inmate is physiologically different, no two prisoners would necessarily be similarly situated with respect to the siting of IV lines. While Lopez may be correct that the pain suffered by an inmate could depend on whether the Director elects to use a peripheral or femoral line, Lopez does not demonstrate that the Director has exercised his discretion in a manner that increases a prisoner's risk of being subjected to an objectively intolerable risk of pain. Nor does he demonstrate that the Director has exercised his discretion in a constitutionally prohibited manner, for instance, based on a suspect or any other classification. The district court did not abuse its discretion in holding that Lopez fails to raise a serious question going to the merits on his equal protection claim.

## III.  ACCESS TO COUNSEL

**[14]** In *Towery*, we stated that "[c]ounsel for Towery and Moormann will be permitted in-person visits with their clients, including during the morning of the execution, under the long-standing ADC practice, as reflected in Department Order

---

[6]Unlike Lopez's challenge, the *In re Ohio Execution Protocol Litigation* case involved challenges to deviations from the Ohio execution protocol by prison officials other than the Director, despite language in the Ohio protocol that the Director, and only the Director, could approve such deviations. 2012 WL 84548, at *9. Some of these deviations removed various procedural protections contained in the Ohio execution protocol—for example, requirements to review an inmate's medical chart—which arguably exposed the inmates to differing risks of pain depending on whether the written protocol was followed. Lopez's argument, however, appears to be that the Director's exercise of discretion *under the protocol* is itself unconstitutionally impermissible.

710-IO-F (Nov. 5, 2004), § 710.02, ¶ 1.3.3.5." 672 F.3d at 658. Our decision in *Towery* was expressly contingent upon the State's representations and commitments made during the preliminary injunction hearing before this court. *Id.* Contrary to the Director's assertion, *Towery* did not "incorrectly rely on a 2004 protocol referring to visitation." Instead, we noted that the 2004 protocol—which permitted counsel visits up to 45 minutes—was representative of the ADC's long-standing practice of permitting counsel in-person visits with clients, including during the morning of the execution.[7] Consistent with its representations to this court, the State permitted in-person non-contact attorney visits until 9:15 a.m. on the mornings of Towery's and Moormann's executions.

The ADC now claims that its representations in *Towery* were limited to the Moormann and Towery executions and did not waive the Director's right to exercise his discretion with respect to the scheduling of future in-person attorney visits on the morning of a scheduled execution. In fact, for Kemp's execution, the Director notified Kemp's attorney that attorney visitation would be permitted from 6:00 a.m. until

---

[7]*See* ADC Internal Management Procedure 500.4 (Feb. 4, 1986) § 4.4.5 ("Visits from the Attorney of Record and a Chaplain of condemned inmate's choice shall be permitted up to ½ hour prior to the scheduled time of the execution."); Internal Management Procedure 500 (Mar. 10, 1993) § 5.6.3.6 ("Non-Contact Visits from the Attorney of Record and a Chaplain of condemned inmate's choice shall be permitted up to two hours prior to the scheduled execution."); Internal Management Procedure 500.4 (Dec. 24, 1994) § 5.2.1.2.4 ("Visits from the Attorney of Record and a Chaplain of condemned inmate's choice shall be permitted up to one-half hour before the scheduled execution time."); Department Order 710-IO-F (Nov. 5, 2004) § 1.3.3.5 ("Visits from the Attorney of Record and a Department Chaplain of condemned inmate's choice are permitted up to forty-five (45) minutes prior to the scheduled execution."); Department Order 710.09 (Sept. 15, 2009) § 1.6.2 ("The inmate's visitation privileges shall be terminated at 2100 hours the day prior to the execution, excluding non-contact visits with the inmate's Attorney of Record and facility chaplain as approved by the Division Director for Offender Operations."); Department Order 710.09 (May 12, 2011) § 1.5.2 (same).

7:00 a.m. on the morning of the execution; any subsequent contact would occur telephonically and only within the discretion of the Director. The ADC has notified Lopez that a similar practice will be used for his execution.

We made clear in *Towery* that the State's repeated ad hoc modifications to its written protocol—"through add-on practices, trial court representations and acknowledgments, and last minute written amendments"—is not sustainable. 672 F.3d at 653. Since the implementation of Department Order 710.09 in September 15, 2009, Arizona has incrementally, and without reason, imposed restrictions on in-person non-contact attorney visits on the morning of a scheduled execution. The 2012 Protocol, as written, permits the Director to preclude any in-person non-contact visits with counsel beyond 9:00 p.m. the day before the execution. Lopez is understandably concerned about what will actually occur in his case. While the State assured us at oral argument that the Director has no plans to deviate from his current practice of permitting attorney non-contact visits from 6:00 to 7:00 a.m. on the morning of the execution, we once again find ourselves evaluating a practice that is not, in fact, the written protocol.

The State cites confidentiality of the execution team and timeliness of the execution as concerns that justify the written prohibition. While confidentiality is a legitimate concern in the abstract, the State proffers no contemporaneous evidence of any breaches of confidentiality by defense counsel. *See Cal. First Amend. Coalition v. Woodford*, 299 F.3d 868, 880 (9th Cir. 2002) (noting that defendants' fear that execution team members will be publicly identified and retaliated against was an overreaction, supported only by questionable speculation). The State also fails to provide evidence that attorney visits led to delays in the execution. For example, Moormann's execution started on time even though counsel was meeting with Moormann until 9:15 a.m. And prior versions of the protocol permitted non-contact visits up to 30 minutes before the execution. Thus, the State has failed to

provide, and we cannot discern, any penological justification for the 9:00 p.m. cutoff on the day before the execution, nor for the 7:00 a.m. cutoff on the morning of the execution. *Id.* at 878 ("in reviewing a challenge to a prison regulation that burdens fundamental rights, we are directed to ask whether the regulation is reasonably related to legitimate penological objectives, or whether it represents an exaggerated response to those concerns." (quoting *Turner v. Safley*, 482 U.S. 78, 87 (1987)) (internal quotation marks omitted)).

**[15]** The difficulty with the State's variable limitation on attorney visits on the morning of the execution is that an individual petitioner has no expectation baseline. The policy can change up to the last hour. Until the record is developed through trial and final resolution of the underlying litigation, counsel and the court are subject to the "rolling protocol." *Towery*, 672 F.3d at 653. To stabilize the counsel visit protocol, as an interim temporary matter, pending trial and any subsequent appeal, we direct the Director to permit counsel in-person non-contact visitation until 9:00 a.m. on the morning of a scheduled execution.

The remainder of Lopez's counsel challenge deals with having counsel observe the IV-placement procedure. The district court did not abuse its discretion in denying this request.

## IV. EVIDENTIARY HEARING

**[16]** Lopez claims that the new evidence relating to the executions of Moormann, Towery, and Kemp tips the likelihood of success in his favor. As discussed above, the new evidence does not alter our conclusion that the district court did not abuse its discretion in denying Lopez's motion for a preliminary injunction. *See Stanley v. Schriro*, 598 F.3d 612, 617 (9th Cir. 2010) (noting that this court reviews denials of evidentiary hearing requests for an abuse of discretion).[8] An evi-

---

[8]A doctor's speculation that Kemp's shaking "suggests a partial seizure" caused by either the "medication administration, previous head injury or stroke, or a history of seizures," is insufficient to raises a serious question going to the merits.

dentiary hearing was not required or warranted, and the district court did not abuse its discretion in so concluding. *See Silva v. Woodford*, 279 F.3d 825, 833 (9th Cir. 2002) (noting that an evidentiary hearing is required where a defendant's "allegations, if proved, would establish the right to relief.").

## CONCLUSION

**[17]** The district court did not abuse its discretion in denying the injunction. Lopez's emergency motion for a stay of execution is denied for the same reason.

**AFFIRMED, subject to interim modification with respect to counsel visits. Motion for stay of execution DENIED.**

---

BERZON, Circuit Judge, concurring in part and dissenting in part:

We find ourselves once again ruling on life and death issues on the eve of an execution. And once again, these issues arise on an appeal of the denial of an emergency motion for a stay of execution sought on the basis that the lethal injection mode of execution as the state will administer it will create such a substantial risk of serious pain as to violate the Eighth Amendment. *See Towery v. Brewer*, 672 F.3d 650 (9th Cir. 2012); *Beaty v. Brewer*, 649 F.3d 1071 (9th Cir. 2011); *Landrigan v. Brewer*, 625 F.3d 1144 (9th Cir. 2010), *vacated by* 131 S. Ct. 445 (2010).

In this instance, I cannot help but concur in the majority's conclusion that Lopez has not *at this point in the litigation* demonstrated the requisite "serious question" as to whether his execution will violate the Eighth Amendment if allowed to proceed. I also concur in most of the majority's reasoning. In particular, Lopez has not proven that during the Towery

execution, the pain suffered by Towery—for there assuredly was considerable pain, as the majority's account of the hour-long difficulty in setting IV lines illustrates—was sufficiently severe to meet the high standard the Supreme Court has set for finding an Eighth Amendment violation in carrying out an execution. *See Baze v. Rees*, 553 U.S. 35, 50 (2008). Without that proof, Lopez cannot project that he will be exposed to the risk of similar treatment, and therefore to a risk of harm so great as to constitute cruel and unusual punishment. Moreover, given the exceedingly short time before his execution, it will be impossible for Lopez ever to so prove, even if Towery did in fact suffer cruel and unusual punishment, or to avoid similar unconstitutional punishment for himself.

For me, unlike for the majority, that failure of proof cannot be the end of the story in this preliminary injunction appeal. It is far from clear to me that, were there the opportunity for this litigation to proceed in the ordinary course—that is, through full discovery—the requisite proof will not be available. And I lay the blame for the present state of this litigation at the feet of the State.

In my view, Arizona has through its approach to devising, announcing, and recording the execution procedures it uses effectively denied Lopez of his procedural due process right to have his Eighth Amendment challenge heard at a meaningful time in a meaningful manner. It has done so by (1) granting the Director immense discretion in determining crucial aspects of the execution procedure rather than explaining in advance in any detail how the execution will be carried out; (2) ensuring that the important phases of executions are carried out behind closed doors; and (3) providing little information after-the-fact to the public, and to inmates awaiting execution and their lawyers as to the details of recent executions, including information as to the causes and impact of difficulties such those encountered during Towery's execution —difficulties that, for all we now know, *might* be "sure or

very likely to cause . . . needless suffering," *Baze*, 553 U.S. at 50, and might indeed have caused Towery such suffering.

1.   As we recounted in the last appeal in this case: Although "the procedures for [carrying out the death] penalty must be implemented in a reasoned, deliberate, and constitutional manner[, o]ver time, the State of Arizona . . . has insisted on amending its execution protocol on an ad hoc basis —through add-on practices, trial court representations and acknowledgments, and last minute written amendments— leaving the courts with a rolling protocol that forces us to engage with serious constitutional questions and complicated factual issues in the waning hours before executions." *Towery*, 672 F.3d at 653. "This approach cannot continue," we warned. *Id.*

But it has. Just as Arizona chose not to follow the protocol we upheld in *Dickens v. Brewer*, 631 F.3d 1139 (9th Cir. 2011), instead amending its protocol by watering down to vagaries and assertions of directorial discretion its core protections, so it has backtracked on some of the assurances provided us by counsel during the first appeal in this case. In ruling on Moorman and Towery's emergency motions for stays, we relied on the State's representations made during oral argument regarding both the qualifications of the IV Team and access to counsel. *Towery*, 672 F.3d at 658. We viewed these representations as binding on the State, and explicitly conditioned our holding on them. *Id.* Now we are told that the access to counsel has been cut back from what we approved, that any in-person contact with counsel the day of the execution is available only at the Director of the Arizona Department of Corrections' ("Director") discretion, and that although the expectation is that the IV Team for Lopez's execution will again consist of a doctor and a nurse, the Director has no obligation to assure that such medically qualified personnel are available and may not do so in the future.

The upshot is that Lopez, and others facing execution in the future, are not presented with any written, binding protocol

such as the ones in *Baze* and in *Dickens* on which to focus in determining whether their impending execution will meet constitutional standards. Instead, the information they are provided consists largely of last-minute representations by counsel for the Director as to how the Director expects to carry out the immediately impending execution.

This mode of proceeding is particularly problematic here because, in my view, the January, 2012 protocol is probably unconstitutional as written in significant respects. We never reached the question in the previous appeal of the constitutionality of the written protocol, and the majority does not reach it here, because the last minute representations made by counsel filled in the likely constitutional gaps with for-this-execution-only promises concerning how the Director was prepared to constrain his declared discretion. But on the issue of the IV Team's qualifications and training and of the issue of access to counsel, the written protocol appears to me both to "create[ ] a demonstrated risk of severe pain" *Baze*, 553 U.S. at 61, and to sanction the possibility of an unconstitutional denial of the right to counsel.

For example, where the protocol approved in *Dickens* required that IV Team members be "medically trained," Arizona's January, 2012 protocol now requires only that the individuals inserting peripheral IV lines be "appropriately trained." Where the earlier protocol required that IV Team members have "current and relevant professional experience," it now requires only "one year of relevant experience," which could have been in the distant past. *Towery*, 672 F.3d at 654. In the Arizona executions reviewed in *West v. Brewer*, for instance, the IV settings in the challenged executions were carried out by a correctional officer who hadn't set an IV line in 15 years and had no specific recollection of the military training in which he was taught this procedure. 2011 WL 6724628, at *6 (D. Ariz. Dec. 21, 2011).

These concerns are only heightened by the protocol's equally watered-down training requirements. The protocol we

approved in *Dickens* required that the IV Team members "responsible for inserting the IVs" must participate in "at least ten rehearsals per year." 631 F.3d at 1143. The 2012 protocol requires only "one training session . . . within one day prior to a scheduled execution." *Towery*, 672 F.3d at 655. These standards are so lax as to both qualifications and training that they may well create a significant *risk* that the team that is assembled in any given execution will be incompetent to carry out the execution without causing severe pain.

In addition to permitting the Director to assemble an incompetent IV Team, the 2012 protocol also permits the Director to restrict beyond the bounds permitted by the Constitution an inmate's right to counsel in the final hours before he is to be executed. Arizona's practice under earlier protocols had been to permit non-contact visits by both attorneys and a facility chaplain the morning of the execution, in many instances up until 45 minutes before the scheduled time of execution. *Id.* at 658. The 2012 protocol, however, grants the Director the discretion to forbid attorney visits—but not the visits of the facility chaplain—after 9 p.m. the night before an execution. *Id.* at 655.

The constitutional right of access to the courts includes the right to in-person visits with counsel. *Ching v. Lewis*, 895 F.2d 608, 610 (9th Cir. 1990). That right cannot be restricted without some legitimate penal justification. *Id.*; *see also Turner v. Safley*, 482 U.S. 78, 89 (1987). The state has to this point offered none. While it has suggested that allowing attorney visits in accordance with the old protocol could cause delays, Moorman's execution, to cite just one example, proceeded in a timely manner despite his meeting with his attorney up until 9:15 a.m. The state's interest in maintaining the confidentiality of IV Team members also cannot justify this restriction, as facility chaplains are assured access on the morning of the execution under the new protocol; presumably, chaplains are as observant as lawyers regarding who is present at the site of the execution. Moreover, the attorneys

for condemned prisoners in Arizona have been required to agree to confidentiality regarding the identity of the individuals preparing to carry out the execution before obtaining access to their clients and have done so—without, as far as the record shows, any breaches in confidentiality. The upshot is that neither the delay concern nor the confidentiality rationale rests on any factual basis in the present record.

2. Despite these apparent deficiencies in the governing protocol, it is impossible at this juncture to say with the requisite degree of assurance whether the particular procedures that will be used to execute Lopez will create a "substantial risk of serious harm." *Towery*, 672 F.3d at 653 (quoting *Baze*, 553 U.S. at 49-50). This uncertainty is not due to any failing on the part of Lopez or his attorneys. Instead, by continually making representations at the last minute regarding self-imposed, but transient, limitations on the broad discretion accorded by the protocol, the Director has both precluded the affected inmates from litigating the risk of serious harm created by the protocol itself *and* cabined those inmates' ability to litigate fully, after the usual discovery and opportunity to obtain expert testimony and other evidence, the actual circumstances of their own executions, and to do so in advance of the day they will be put to death. Their attorneys have been relegated to repeated, exhausting, preliminary injunction eve-of-execution challenges to the constantly moving target that Arizona's practices have created. Such challenges necessarily proceed on truncated records, and appeals are limited by the abuse-of-discretion standard. *Lands Council v. McNair*, 537 F.3d 981, 986 (9th Cir. 2008) (en banc).

Moreover, other aspects of the manner in which Arizona has been carrying out its now-frequent executions—there have been three in the last four months—further stymie any meaningful ability of condemned prisoners to litigate before they are put to death the constitutionality of the procedures that will be used to execute them. Aside from challenging the written protocol on its face, another way condemned prisoners

can attempt to demonstrate the likely impact of the procedures that will be used during their execution is to demonstrate that past executions carried out in accord with similar procedures have resulted in executions that violated the Eighth Amendment. But that approach can succeed only if there is detailed information available concerning past executions carried out with similar procedures.

Arizona puts impenetrable roadblocks in the way of obtaining such information in time to use it before a condemned prisoner is executed. First, the state insists upon extreme secrecy in carrying out executions. Witnesses are allowed only at the very end of the lethal injection process, during the actual administration of the lethal drugs after the IV lines have been set and the drugs concocted and readied for administration. Most of what can go wrong will go wrong *before* the small part of the execution process exposed to public view.

We have held that the First Amendment requires broader public access to the process of carrying out executions— which are, after all, carried out as a result of public decisions, in implementation of a controversial public policy. *See California First Amendment Coalition v. Woodford*, 299 F.3d 868 (9th Cir. 2002). There has been no First Amendment challenge of which I am aware to Arizona's contrary practice, and I am not suggesting that we should hold the practice unconstitutional on that basis at this juncture. But the fact that California and other states, *see* Ohio Execution Policy 01-COM-11, § IV.G.4, have carried out their executions in full view suggests one way in which Arizona could provide a fair opportunity to challenge future executions conducted similarly— namely, by exposing to the public the actual impact of the procedures used and thereby permitting exposure through media and witnesses of any indications of serious pain during those executions.

Second, as the majority opinion describes, Arizona has recently increased the secrecy with which it conducts execu-

tions in another way: Although it used to keep detailed logs concerning what occurred during executions, its recent logs have been summary and perfunctory, making them useless for the purpose of discovering why whatever went wrong went wrong, and what was the impact on the prisoner being executed. One can only surmise that the reason for this change was to make it more difficult for condemned prisoners to litigate the nature of the risk created by the procedures used in the past; no other reason for recording less about the execution process than was done before comes to mind.

Third, as the majority opinion also describes, Arizona makes sure that the prisoners about to be executed cannot themselves describe any pain they suffered or mistakes made during the execution, by threatening to cut off their last statement if they do so. According to the undisputed record in this case, inmates have been told that their microphones will be cut off if they make statements critical of the Arizona Department of Corrections. In an attempt to adjust to this edict, Towery and his lawyer developed a code by which Towery indicated that he sought access to counsel during the setting of the IV lines and was denied, and may have indicated that the execution procedures had caused him pain.

Finally, in a recent letter to Director Charles Ryan, Lopez's lawyers, who also represent the other plaintiffs in this lawsuit, have requested that they be permitted to observe the pre-execution process or observe videotapes of it. With appropriate assurances of confidentiality as to the identity of the individuals participating in the execution, such a procedure could provide a measure of procedural due process to other plaintiffs, if not to Lopez, by allowing some meaningful access to essential information that the state refuses otherwise to provide. But the request has not been granted.

These secrecy restrictions and refusals of public and attorney access, taken together, leave condemned prisoners, their attorneys, the district court, and this court with precious little

indication of whether past executions have actually been conducted in a constitutional manner. The condemned clients, without access to their attorneys, are left to communicate with them in elaborate codes during their last statements, while we are left to parse cryptic execution logs and autopsy reports in an effort to determine whether an inmate suffered pain, and if so, how much.

The trouble that plagued Towery's execution highlights the practical problems this obsessive secrecy creates for any meaningful litigation in the constricted time periods permitted by Arizona's moving target approach to execution procedures. After approximately half an hour trying to site a functioning catheter, the Director decided, for reasons unknown, to contact the Attorney General's office and provide "an update regarding the IV process." So the Director had access to counsel during the execution, although Towery—despite asking for such access at some point—did not. After 50 minutes— just 10 minutes short of the hour time limit allotted for this task under the protocol reviewed in *Baze*, 553 U.S. at 55—a femoral catheter had finally been placed. Only 59 minutes into the execution did the IV team succeed in placing a backup line (in a location known to create a danger of pain if used to administer drugs, so the backup line was either useless or possibly unconstitutional). An autopsy showed that Towery's arms had been pierced several times, and that his femoral artery had been pierced as well.[1] This entire process was conducted behind closed doors and, as the majority notes, recorded in only the most general of notes. Because of the secrecy, we have no way of knowing the degree of pain caused Towery; for all we know, it reached the standard for unconstitutional punishment set in *Baze*. It is possible that discovery during the course of this lawsuit could establish, through expert evidence and depositions of those present that it did — but by then, Lopez will be long dead, as, in all likeli-

---

[1]The record establishes that administering pentobarbital into the femoral artery rather than the vein can be very painful.

hood, will be some or all of the remaining plaintiffs. None of the executed individuals will have had a fair chance to litigate the constitutionality of the procedures applied to them during their execution.

To my mind, this *combination* of circumstances, not any one of them—the last minute changes in protocols; the even more last minute attestations to limitations on the Director's discretion for individual executions; the lack of access of the public and counsel to the pre-execution procedures; the failure to record in any detail what occurs during executions; and the restrictions on any reports by the condemned prisoners themselves of pain encountered during the execution process— amounts to a procedural due process violation. Lopez clearly has a liberty interest in avoiding a mode of execution that constitutes cruel and unusual punishment. *See Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003). The events that took place during the Towery execution demonstrate that there is at least some risk that Lopez will be subjected to such an unconstitutional execution. Yet, Lopez has effectively been denied his right to be heard in a meaningful manner before he dies concerning the constitutionality of the processes that will be used to execute him. And this due process problem is not intractable; it could be solved in a variety of ways, including (1) providing a detailed written protocol that restricts the Director's discretion and is actually followed in executions; (2) keeping and making available detailed accounts of the actual execution processes, including any evidence of the impact on the pain perception by those executed; (3) providing either for public access or for more limited access by counsel to the pre-execution proceedings.

"[P]rocedural due process rules are shaped by the risk of error inherent in the truth-finding process." *Matthews v. Eldridge*, 424 U.S. 319, 344 (1976). Here, the risk of error is enormous. There is no redo, and the result of the constitutional error, if it occurs, will be severe pain, or, at least, a high likelihood of suffering such pain. Without at least one of the

protections I have indicated, the plaintiff will be dead before it is possible to have a hearing as to the constitutionality of his execution that even approximates the access to the relevant facts ordinarily accorded litigants. And the absence of these protections is the result of Arizona's choices, in several instances the choice to cut back on procedural protections previously accorded.

Executing someone convicted of a capital crime is a grim endeavor. Reviewing the details of impending executions to assure against unconstitutional executions is grim as well, a task judges would rather avoid. Yet, while we as judges cannot and should not micromanage executions, we do have an obligation to stand as a last bulwark against excessively painful administrations of the death penalty. To do that, we need to be presented with the relevant facts, gathered in some feasible fashion. As matters now stand, Arizona has made the gathering of such facts by condemned prisoners so difficult that meaningful judicial consideration at a relevant time is not possible. By doing so, Arizona has denied Lopez, and others awaiting execution in Arizona, due process of law. I would stay Lopez's execution until this denial of due process is corrected by one or more of the means I have indicated.[2]

---

[2]Given the press of time under which we have operated in this case, I may wish to further explain my views on this matter at a later date.