**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROBERT CHARLES TOWERY; ROBERT HENRY MOORMANN; PETE ROVOGICH; THOMAS ARNOLD KEMP; MILO MCCORMICK STANLEY; SAMUEL VILLEGAS LOPEZ, <br><br> Plaintiffs - Appellants, <br><br> v. <br><br> JANICE K BREWER, Governor of Arizona; CHARLES L. RYAN, Director, Arizona Department of Corrections; RON CREDIO, Warden, Arizona Department of Corrections-Eyman; LANCE R. HETMER, Warden, Arizona Department of Corrections-Florence; UNKNOWN PARTIES, IV Team Leader; IV Team Members 1-5; Special Operations Team Leader; Special Operations Team Recorder; Special Operations Team Members 1-5; and Does 1-25, <br><br> Defendants - Appellees. | No. 12-15381 <br><br> D.C. No. 2:12-cv-00245-NVW <br><br> OPINION |

Appeal from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

Argued and Submitted February 27, 2012

Phoenix, Arizona

Before: McKEOWN, BERZON, and RAWLINSON, Circuit Judges.

Per Curiam:

This appeal under 42 U.S.C. § 1983 challenges Arizona's execution protocol, adopted as Order 710 of the Arizona Department of Corrections ("ADC") on January 25, 2012. Robert Charles Towery, Robert Henry Moormann, Pete Rovogich, Thomas Arnold Kemp, Milo McCormick Stanley, and Samuel Villegas Lopez are death row inmates in Arizona who claim that ADC's execution protocol violates the Eighth and Fourteenth Amendments. Towery and Moormann, two of the named plaintiffs with impending execution dates, moved the district court for a preliminary injunction against ADC's use of its current lethal injection protocol. The district court denied the preliminary injunction, and Towery and Moormann appealed. Because the new protocol was adopted on the eve of the two planned executions, this appeal comes to us at the eleventh hour. We held oral argument less than 48 hours before the first scheduled execution.

Even after the appeal was filed and hours before the argument, Arizona yet again changed course as to its plans for the executions.[1] It advised the court on February 27, 2012, that it was not proceeding under the three-drug protocol but instead under the one-drug protocol because it discovered at the last minute that the originally-planned drugs had expired in January 2012. How such a discovery escaped the State for the past six weeks is beyond us, and gives us pause as to the regularity and reliability of Arizona's protocols. To be sure, the State caught the mistake, but almost too late.

"The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity." *Furman v. Georgia*, 408 U.S. 238, 306 (1972) (Stewart, J., concurring). Because the death penalty is undeniably the most serious penalty available to a State, the procedures for such penalty must be implemented in a reasoned, deliberate, and constitutional manner. Over time, the State of Arizona, however, has insisted on amending its execution protocol on an ad hoc

---

[1] The death warrants were issued on January 11, 2012 and notice of the three-drug protocol was issued on February 2, 2102.

3

basis—through add-on practices, trial court representations and acknowledgments, and last minute written amendments—leaving the courts with a rolling protocol that forces us to engage with serious constitutional questions and complicated factual issues in the waning hours before executions. This approach cannot continue.

Although we uphold the denial of the preliminary injunction based on the 2012 Protocol, as amended by the State during oral argument with respect to Towery and Moormann's executions, the State's frequent changes to its protocol during litigation are not sustainable. We find ourselves, once again, deciding not the merits of Arizona's *written* protocol, but the validity of litigation-related, often case-specific, amendments to the protocol designed to ensure constitutionality. We are mindful of the admonition requiring us to refrain from micro-managing each individual execution, but the admonition has a breaking point. The State appears to have invited the present litigation through its recent amendment of the protocol *after* the issuance of Towery and Moormann's death warrants. Unless permanent changes are made in the manner in which Arizona amends its protocols, Arizona's ongoing conduct may require us "to monitor every execution on an ad hoc basis, because the State cannot be trusted to fulfill its otherwise lawful duty to execute inmates sentenced to death." *In re Ohio Execution Protocol Litigation*, ___ F.3d

4

___, No. 12-3035, 2012 WL 118322, at *1 (6th Cir. Jan. 13, 2012). We trust this will not be the case.

On the basis of the protocol approved in *Dickens v. Brewer*, 631 F.3d 1139 (9th Cir. 2011), as well as the State's undertakings as to the upcoming executions, we affirm the denial of the preliminary injunction, albeit on different grounds than underlay the district court's denial.

## BACKGROUND

### I.   THE *BAZE* STANDARD

In *Baze v. Rees*, the Supreme Court held that Kentucky's three-drug lethal injection protocol does not violate the Eighth Amendment's prohibition on cruel and unusual punishment. 553 U.S. 35 (2008). The plurality held that the Kentucky protocol is constitutional because it contains sufficient safeguards to prevent improper anesthetization, and thus does not give rise to a "substantial risk of serious harm." *Id.* at 49-50.

Faced with the Justices' divergent views, our circuit adopted the plurality's substantial risk of serious harm standard as the governing one because it is the narrowest necessary to secure a majority in any given challenge to a method of execution. *Dickens*, 631 F.3d at 1144-45. We explained that "[e]very circuit court

5

that has considered a challenge to a lethal injection protocol following *Baze* has analyzed the protocol under the plurality's substantial risk standard." *Id.* at 1145.

## II. ARIZONA'S LETHAL INJECTION PROTOCOL DURING *DICKENS*

Since the end of a six-year hiatus in implementation of the death penalty from 2000 to 2006, Arizona has conducted executions by lethal injection. Prior to the 2012 changes in its lethal injection protocol, Arizona used a three-drug lethal injection cocktail that consisted of three chemicals—sodium thiopental, pancuronium bromide, and potassium chloride—administered sequentially. Sodium thiopental is a fast-acting barbiturate that anesthetizes the inmate and permits the other chemicals to be administered without causing pain. Pancuronium bromide is a paralytic neuromuscular blocking agent that causes complete paralyzation and suffocation. Potassium chloride induces cardiac arrest. In *Dickens*, we constrained our holding to the constitutionality of Arizona's November 1, 2007, protocol, as amended by the Joint Report (the "2007 Protocol"), and did "not conside[r]—and express[ed] no opinion on—any amendments to the [2007] Protocol." 631 F.3d at 1142.

## III. ARIZONA'S CURRENT (2012) LETHAL INJECTION PROTOCOL

Since *Dickens*, ADC has made various amendments to its lethal injection protocol. Some of those were informal amendments through practice, and others

were incorporated into a formal departmental order. At issue here is ADC's

January 25, 2012, amendment to Department Order 710 (the "2012 Protocol").

The revised 35-page protocol permits execution through either a three-drug or

one-drug protocol and requires ADC to choose between these two protocols at least

seven days prior to a scheduled execution.[2] 2012 Protocol, § 710.01, ¶ 1.1.2.4 &

Attach. D, § C.1.

The 2012 Protocol further directs that the ADC Director ("Director"), upon

consultation with the IV Team Leader, shall determine the catheter sites and that, at

the Director's choice, a central femoral line may be utilized instead of a peripheral

IV line if placed by a medically-licensed physician with relevant experience. 2012

Protocol, Attach. D, § E.1.

The 2012 Protocol also changed the composition and experience

requirements for the IV Team:

> The IV Team will consist of any two or more of the following: physician(s), physician assistant(s), nurse(s), emergency medical technician(s), paramedic(s), military corpsman, phlebotomist(s) or other appropriately trained personnel including those trained in the United States Military. All team members shall have at least one year of relevant

---

[2] If a three-drug protocol is used, executions will occur via administration of a sequence of three drugs—either sodium pentothal or pentobarbital, pancuronium bromide, and potassium chloride. If a one-drug protocol is used, executions will occur via administration of either sodium pentothal or pentobarbital.

experience in placing either peripheral or central femoral intravenous lines.

2012 Protocol, § 710.02, ¶ 1.2.5.1. The 2007 Protocol held constitutional in *Dickens* required "medically trained personnel" instead of allowing the Director to hire "other appropriately trained personnel," and required one year of "current and relevant professional experience in their assigned duties on the Medical Team" rather than just one year of "relevant experience." *Compare Dickens*, 631 F.3d at 1142-43 *with* 2012 Protocol, § 710.02, ¶ 1.2.5.1. In addition, the 2012 Protocol requires IV Team members to participate in "at least one training session with multiple scenarios within one day prior to a scheduled execution" rather than, as at the time of *Dickens*, "at least ten execution rehearsals per year, and, if a Warrant of Execution issues, train weekly up until the execution." *See Dickens*, 631 F.3d at 1142; *see also* 2012 Protocol, § 710.02, ¶ 1.2.5.5. Finally, the 2012 Protocol permits only telephonic contact between an inmate and his attorney after 9:00 p.m. the night before a scheduled execution, whereas previously counsel were permitted unlimited non-contact visitation until very shortly before the execution. 2012 Protocol, § 710.11, ¶ 1.5.

8

## IV.    DISTRICT COURT PROCEEDINGS

In the district court, Towery and Moormann alleged that ADC's revised protocol impermissibly eliminates safeguards by increasing the Director's discretion, and codifies arbitrary and disparate treatment of capital prisoners, in violation of the Eighth and Fourteenth Amendments. They further alleged that ADC's intent to execute them using pancuronium bromide imported from a foreign source is improper. Finally, they alleged that the 2012 Protocol violates their due process right to notice concerning the specific drugs and venous access to be used during execution, and also the right of access to counsel and the courts.

Towery and Moormann moved for a preliminary injunction to enjoin their executions to allow for litigation of these claims. The district court held a hearing, and the parties elected not to present live witnesses. On February 23, 2012, the court denied the request for a preliminary injunction.

### A.    EIGHTH AMENDMENT

The district court held that Towery and Moormann had not presented a substantial likelihood of success on the merits regarding their claim that the 2012 Protocol facially violated the Eighth Amendment. The district court's review was based on a very different scenario than the one presently before us, as it focused on the three-drug protocol.

9

Towery and Moormann claimed that five specific changes led to a facial constitutional flaw: 1) IV Team members (previously known as MTMs) were no longer required to have "current" experience placing IV lines; 2) IV Team members were no longer required to be medically trained; 3) IV Team members now needed to attend only one training session the day before the execution; 4) there was no longer a time limit in which the IV Team had to insert the IVs; and 5) both a primary and a backup IV line were no longer required.

The district court concluded that the changes to the 2012 Protocol did not create a substantial risk of pain and suffering. In reaching its conclusion, the district court referenced its determination in *West v. Brewer*, No. CV-11-1409-PHX-NVW, 2011 WL 6724628 (D. Ariz. Dec. 21, 2011) (unpublished order), *appeal docketed*, No. 12-15009 (9th Cir. Jan 3. 2012), that deviations from ADC's prior protocol requiring one year of "current" experience were "reasonable in light of both the difficulty in locating qualified individuals and the IV Team's extensive past experience." Based on the district court's determination in *West* that the two IV Team members at issue there were constitutionally proper, ADC changed its protocol to permit any "appropriately trained personnel" to serve on the IV Team and eliminated the requirement that the relevant experience be one year of "current" experience. The district court here held that *Baze* did not create a floor

10

regarding constitutionally permissible execution protocols, nor did it require "current" experience or multiple practice sessions. Therefore, the district court held, in light of the remainder of the protections in place, the inmates' challenge rested on speculation that ADC would hire inept IV Team members.

The additional protections the district court found relevant include the: 1) required use of a backup catheter; 2) heparin/saline flush, which ensures that the IV lines are kept open; 3) Warden's personal oversight over the entire process; 4) use of an electrocardiograph; 5) constant monitoring by the execution team of the inmate during the process; and 6) physical confirmation by the IV Team Leader that the inmate is unconscious prior to the administration of the second drug of the three-drug cocktail. The district court also dismissed the concern that a time limit to set the IV lines was necessary since any minor pain involved with multiple attempts to locate an adequate vein did not create a substantial risk of severe unconstitutional pain.

## B. EQUAL PROTECTION

Towery and Moormann claimed that the 2012 Protocol violates their right to equal protection because the protocol gives the Director discretion regarding the: 1) drugs used for the execution; 2) selection of execution team members; and 3) use of the backup catheter. The district court held that each individual was not a

11

"class of one," and therefore the discretion vested within the Director could not violate the individual's equal protection rights. Alternatively, even if Towery and Moormann, individually, were a "class of one," a rational basis existed for vesting discretion in the Director, because drug supply issues could mandate that the one-drug option be chosen over the three-drug option. According to the district court, the same reasoning applied to the availability of qualified individuals to serve as execution team members. With respect to the backup catheter, the district court held that the Director did not have any discretion.

### C. IMPORTATION OF PANCURONIUM BROMIDE AND NOTICE

Towery and Moormann also argued that the use of imported pancuronium bromide was problematic. The district court disagreed, citing *Cook v. Brewer*, 637 F.3d 1002, 1007-08 (9th Cir. 2011). The district court also disagreed with the contention that there is a liberty interest in knowing which drugs will be used for the execution and where the IV lines will be placed.

### D. THE RIGHT TO COUNSEL

Finally, the district court upheld the prohibition on in-person contact with the condemned's attorney after 9:00 p.m. on the day before the scheduled execution. It found the prohibition proper because "of increased concerns

regarding the need to protect" the identities of persons participating in the execution process.

## ANALYSIS

On appeal, Towery and Moormann challenged only three aspects of the district court's denial of the preliminary injunction: 1) the constitutional infirmity of the 2012 Protocol under *Baze*; 2) the disparate treatment levied upon each individual inmate due to the Director's discretion (equal protection claim); and 3) the prohibition on in-person contact with an attorney after 9:00 p.m. on the day prior to the scheduled execution.[3]

Before the hearing on the preliminary injunction, the State gave notice that it would proceed with the three-drug protocol. On February 27, 2012, however—less than 48 hours before the first scheduled execution—the State changed its mind and filed a Notice of Intent to Administer the One-Drug Protocol, explaining that it discovered during training sessions that its foreign-supplied pancuronium bromide expired in January 2012. Because of the unavailability of

---

[3] Towery and Moormann did not challenge on appeal the district court's decision regarding the imported pancuronium bromide, or the lack of notice as to which drugs will be used during the execution and where the IV lines will be placed (except to the extent those issues are relevant to the equal protection challenge). We therefore do not consider those issues.

13

pancuronium bromide, ADC intends to use only domestically-obtained pentobarbital and to administer a one-drug protocol.

Consequently, due to last minute changes by the State regarding the protocol that will be used during Towery and Moormann's executions, the landscape of this appeal has changed dramatically. We now address only the one-drug aspects of the 2012 Protocol, as supplemented by the State's representations and commitments made in the hearing before us on February 27, 2012.

## I.    STANDARD FOR GRANTING A PRELIMINARY INJUNCTION

A preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted). Under the "serious questions" version of the test, a preliminary injunction is appropriate when a plaintiff demonstrates that "serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (citation omitted). This approach requires that the elements of the preliminary injunction test be balanced, so that a stronger showing of one element may offset a weaker showing of another. "'[S]erious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so

14

long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* We review the denial of a preliminary injunction for abuse of discretion. *Lands Council v. McNair*, 537 F.3d 981, 986 (9th Cir. 2008) (en banc).

In the context of a capital case, the Supreme Court has emphasized that these principles apply when a condemned prisoner asks a federal court to enjoin his impending execution because "[f]iling an action that can proceed under § 1983 does not entitle the complainant to an order staying an execution as a matter of course." *Hill v. McDonough*, 547 U.S. 573, 583-84 (2006). Rather, "a stay of execution is an equitable remedy" and "equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Id.* at 584.

To obtain preliminary injunctive relief, Towery and Moormann must demonstrate that: 1) they are likely to succeed on the merits of such a claim; 2) they are likely to suffer irreparable harm in the absence of preliminary relief; 3) the balance of equities tips in their favor; and 4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. , 207 (2008). Because the likelihood of success on the merits of the modified protocol as it will be applied to the two upcoming executions is determinative, we discuss it in detail.

15

**II. REVIEW OF 2012 PROTOCOL AND SUPPLEMENTAL REQUIREMENTS**

**A. THE EIGHTH AMENDMENT CHALLENGE**

At the hearing before this court, the State made a number of representations and undertook to alter the 2012 Protocol in various ways with respect to Towery and Moormann. We accept those representations and undertakings as binding on the State. The protocol therefore consists of the following, as it will be applied at Towery and Moormann's executions:

**1. One-Drug Protocol:** We review the 2012 Protocol only as it pertains to the one-drug protocol. We are not reviewing the three-drug protocol; any challenge to the three-drug protocol is moot for purposes of this appeal.

**2. The 2012 Protocol with the following amendments and undertakings, as agreed to by the State:**

**a. Qualifications of the IV Team:** According to the State, the IV Team to be used for both executions is comprised of a licensed nurse with seventeen years of experience and a medically-licensed physician. Both of these individuals have had experience placing IVs within the last twelve months, not including any placements performed or training gained during the recent pre-execution training sessions. The State also reaffirmed the position it took before the district court that "relevant experience," as used in Paragraph 1.2.5.1 of the

16

2012 Protocol, means that IV Team members must have no less than the training that is traditionally given for people to be licensed to place IVs. We view this representation as a binding one that cabins the meaning of "appropriately trained" and "relevant experience" in the context of the 2012 Protocol.

b. **Backup Drugs:** In addition to the full set of syringes to be used "in the implementation of the death sentence," the State represented that there will be one additional set of syringes, along with the necessary chemicals and drugs, available for immediate administration should circumstances so require. The State acknowledged at oral argument that this backup arrangement was "no big deal." The IV Team members shall insert a primary IV catheter and a backup IV catheter, as required by Attachment D, § E.1 of the 2012 Protocol.

c. **Access to Counsel:** Counsel for Towery and Moormann will be permitted in-person visits with their clients, including during the morning of the execution, under the long-standing ADC practice, as reflected in Department Order 710-IO-F (Nov. 5, 2004), § 710.02, ¶ 1.3.3.5.

Our decision is contingent upon the State's representations and commitments made during the preliminary injunction hearing. With these representations, the protocol parallels the one reviewed under *Dickens* with respect to training and qualifications of the IV Team and the availability of backup drugs

17

and catheters. It also mirrors the prior practice regarding access to counsel and resolves Towery and Moormann's claims on these issues.

The remaining claim relates to the number of training sessions. That issue largely goes away in light of the identification of the qualifications of the individuals who will be on the IV Team for Towery and Moormann's executions. Nonetheless, we address it because it was not directly encompassed in the representations made during the hearing before us. We do so, however, not in the abstract, but in light of the training and experience of the current members of the IV Team.

The 2012 Protocol eliminates the requirement that IV Team members participate in ten practice sessions per year. Instead, the IV Team members are only required to participate in training sessions scheduled for one day prior to the actual execution. 2012 Protocol, § 710.02, ¶ 1.2.5.5. While ten trainings may be better than a single one-day training, Towery and Moormann do not make a showing that for their executions the lack of practice occasioned from the singular day of trainings will lead to a substantial risk of harm. An inmate cannot succeed on an Eighth Amendment claim by showing one more step the State could take as a failsafe for other, independently adequate measures. *Baze*, 553 U.S. at 60-61. "Where an execution protocol contains sufficient safeguards, the risk of not

18

adopting an additional safeguard is too 'remote and attenuated' to give rise to a substantial risk of serious harm." *Dickens*, 631 F.3d at 1149 (citing *Baze*, 553 U.S. at 58-59).

The amended 2012 Protocol, as outlined above, on the basis of representations and commitments made at the February 27 hearing, comports with the protocol approved in *Baze*. We therefore conclude that Towery and Moormann have not demonstrated a substantial likelihood of success on their Eighth Amendment challenge.

### B.    DISPARATE TREATMENT—EQUAL PROTECTION CHALLENGE

Towery and Moormann argue that the grant of discretion to the Director to make decisions regarding the manner in which his execution will be carried out violates the Fourteenth Amendment's Equal Protection Clause. We do not agree.

The 2012 Protocol, Towery and Moormann observe, grants the Director the discretion to select members of the IV Team, provided they are "appropriately trained," as well as to designate the IV Team Leader. The Director also has discretion to choose either a three- or one-drug protocol, using either sodium pentothal or pentobarbital and to decide, "upon the advice of the IV Team Leader," whether to use peripheral or central femoral IV access to administer the drugs (as long as a medically-licensed physician is available to implement the latter option).

19

Towery and Moormann maintain that the broad grants of discretion to the Director violate the Equal Protection Clause, either because they burden a fundamental right and so fail strict scrutiny, or because they treat Towery and Moormann, individually, as a "class of one" without a rational basis for doing so. Neither argument has merit.

As we have already determined, the protocol as it will be implemented for Towery and Moormann's executions does not violate their right under the Eighth Amendment to be free from cruel and unusual punishment. Where there is no Eighth Amendment violation, the district court ruled, that necessarily means that there has been no interference with fundamental rights sufficient to trigger strict scrutiny under the Equal Protection Clause. *See Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). We do not need to adopt this broad proposition to conclude that given the ways the Director has chosen to exercise his discretion in the upcoming executions, there has been no showing here of any burden on the right to be free of cruel and unusual punishment.

Towery and Moormann argue otherwise, relying on *Bush v. Gore*, 531 U.S. 98, 105 (2000). Urging that there is a distinction between state action that *violates* a fundamental right and state action that merely *burdens* a fundamental right, they

20

proffer that the latter was sufficient to trigger strict scrutiny in *Bush* and should also be here.

The right to vote, however, "'can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.'" *Id.* (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)). A prisoner's right to be free of cruel and unusual punishment, in contrast, is not affected simply because that prisoner is treated less favorably than another, where one means of execution is no more likely to create a risk of cruel and unusual punishment than the other, and both are constitutionally available. Treating one similarly situated prisoner differently from another with regard to punishment does not inherently impact the right to be free of cruel and unusual punishment (although it might for other reasons violate the Equal Protection Clause).

That is not to say that there could not be exercises of discretion that do burden the right to be free of cruel and unusual punishment. The contrast with the litigation surrounding Ohio's lethal injection protocol, invoked by Towery and Moormann in support of their fundamental rights Equal Protection argument, is instructive. In those cases, plaintiffs were able to show an actual pattern of treating prisoners differently in ways that did affect the *risk* of pain to which they would be

21

subjected, and therefore the *risk* of being subjected to cruel and unusual punishment.  *See In re Ohio Execution Protocol Litig.*, ___ F. Supp. 2d ___, 2012 WL 84548, at \*9 (S.D. Ohio Jan. 11, 2012), *motion to vacate stay denied*, ___ F.3d at ___, 2012 WL 118322, at \*1 (6th Cir. Jan. 13, 2012).  Here, no such showing has been made, either generally or with respect to the planned application of the protocol to Towery and Moormann's executions.  The fundamental rights prong of Equal Protection analysis therefore cannot apply.

Alternatively, Towery and Moormann argue that each is a "class of one," and that the protocol allows the Director to treat him differently from others similarly situated with no rational basis for doing so.  *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  We disagree.

The class-of-one doctrine does not apply to forms of state action that "by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments."  *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 603 (2008).  "In such cases," the Court noted,

> the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted.  In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

22

*Id.*

Here, decisions on matters such as which drug protocol to use, which people to select for the execution team, and whether to use a central femoral IV are, under Arizona's statutory scheme, relegated to the Director, with no State law requirement that there be uniformity. Ariz. Rev. Stat. § 13-757(A). Absent any pattern of generally exercising the discretion in a particular manner while treating one individual differently *and* detrimentally, there is no basis for Equal Protection scrutiny under the class-of-one theory. In other words, the existence of discretion, standing alone, cannot be an Equal Protection violation. At the very least, there must be some respect in which the discretion is being exercised so that the complaining individual is being treated less favorably than others generally are.

Even if we were to subject the protocol's grant of discretion to the Director to rational basis review, it would survive our consideration. It is rational for ADC to conclude that the Director is best situated to select the execution team from those available who meet the criteria listed in the protocol (assuming those criteria do not themselves create a risk of harm greater than that tolerable under the Eighth Amendment), or to decide that the Director should be the one to select which of the four possible drug sequences to use, or to assign to the Director and the IV Team Leader the task of selecting which IV site to use. It is entirely rational for these

23

determinations to be made on a case-by-case basis, as they may well depend on individualized and changing factors such as the availability of particular people to participate in the execution, the supply of drugs available to the State at a given time, and the condition of the prisoner's veins. The Equal Protection claim, as framed here, cannot succeed on the merits.

## C. BALANCE OF INTERESTS UNDER *WINTER* AND *ALLIANCE FOR THE WILD ROCKIES*

We recognize that Towery and Moormann demonstrate irreparable harm, as does every § 1983 plaintiff in an injunction appeal involving an upcoming execution. We also recognize that the State ordinarily has "a strong interest in enforcing its judgments without undue interference from federal courts," although, as indicated at the outset, that interest can be and has been undermined to a degree by Arizona's pattern of behavior in the recent execution litigation. Finally, we also recognize that the victims of crime have an important interest in "timely enforcement of a sentence." *Hill*, 547 U.S. at 584-85. Nonetheless, in light of our conclusion that Towery and Moormann do not raise serious questions going to the merits of their Eighth and Fourteenth Amendment claims with regard to their executions as they will actually be carried out, we conclude that Towery and Moormann do not meet the standards under *Winter* and *Alliance for the Wild Rockies* for issuance of a preliminary injunction.

24

**AFFIRMED; the request for stay of execution is DENIED.**

COUNSEL

Dale A. Baich, Robin C. Konrad and Cary S. Sandman, Federal Public Defender's Office, Phoenix, AZ; David Sepanik and Flora Vigo, O'Melveny & Myers LLP, San Francisco, CA, for plaintiffs-appellants.

Kent Ernest Cattani, Michael E. Gottfried, and Jeffrey A. Zick, Arizona Attorney General's Office, Phoenix, AZ, for defendant-appellees.