**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| SAMUEL VILLEGAS LOPEZ, | No. 12-16084 |
| Plaintiff - Appellant, | D.C. No. 2:12-cv-00245-NVW |
| v. | District of Arizona, Phoenix |
| JANICE K BREWER, Governor of Arizona; CHARLES L. RYAN, Director, Arizona Department of Corrections; RON CREDIO, Warden, Arizona Department of Corrections - Eyman; LANCE R. HETMER, named as: Lance Hetmer/Warden, Arizona Department of Corrections - Florence; UNKOWN PARTIES, named as: IV Team Leader; IV Team Members 1-5; Special Operations Team Leader; Special Operations Team Recorder; Special Operations Team Members 1-5; and Does 1-25, | AMENDED ORDER |
| Defendants - Appellees. | |

Before: THOMAS, Circuit Judge and Capital Case Coordinator.

A panel of this Court issued an opinion affirming the district court's denial of petitioner's motion for a preliminary injunction and denying his motion for a stay of execution. Petitioner filed a petition for rehearing and rehearing en banc. The Warden elected not to file an optional response.

Pursuant to the rules applicable to capital cases when an execution date has been scheduled, a deadline was established by which any judge could request a vote on whether the panel's opinion should be reheard en banc. A judge timely requested a vote on the petition for rehearing en banc. A majority of the judges eligible to vote did not vote in favor of rehearing en banc. Judges Ikuta, Murguia, and Nguyen were recused.

Therefore, the Petition for Rehearing En Banc is DENIED. En banc proceedings with respect to the panel opinion are concluded.



Lopez v. Brewer, No. 12-16084

Chief Judge **KOZINSKI**, with whom Judges **O'SCANNLAIN** and **BEA** join, concurring:


There is profound irony in Lopez's insistence that his death be painless.

This is a description of his crimes, as related by the Arizona Supreme Court:

> Overturned and broken furnishings in the blood-splattered apartment indicated that a tremendous struggle took place prior to the murder. A scarf had been stuffed into the victim's mouth, and she had been blindfolded with her pajama pants. An autopsy revealed that her throat had been slashed, and she had been stabbed twenty-three times in her left breast and upper chest and three times in her abdomen. Seminal fluid was found in both her vagina and anus.

> . . . .

> When the officers arrived at the victim's residence, the apartment's condition evinced that a bloody battle had raged throughout every room in the apartment. Blood was splattered throughout the apartment and there were blood drops on the bathroom and kitchen floors. A concentration of blood drops in the kitchen, as well as the stream of dried blood down the victim's body and onto her bloodstained feet, indicated the victim stood for some time while being stabbed. The victim had three lacerations on her scalp and a stab wound to the left cheek. These injuries, although not fatal, caused a considerable amount of bleeding. The victim had lacerations on her right arm and bruises and cuts on her left hand, all of which were characteristic of defensive wounds.

State v. Lopez, 786 P.2d 959, 962, 966 (Ariz. 1990). "[T]he victim endured great physical and mental suffering over a relatively protracted period of time while she struggled for her life." State v. Lopez, 857 P.2d 1261, 1271 (Ariz. 1993). Based

on what it found to be a vicious and prolonged beating, stabbing, rape and sodomy, the trial judge held that Lopez "murdered the victim in an especially cruel, heinous, and depraved manner." Id.

The panel delicately omits these facts, as did our previous opinion, which merely referred to the crime as "brutal," Lopez v. Ryan, 630 F.3d 1198, 1201 n.1 (9th Cir. 2011), but common decency surely calls on us to acknowledge that Lopez is not the victim here, and whatever pain he may suffer incident to his execution pales in comparison to the agony and terror he inflicted on a defenseless woman whose body he used to sate his lust. Judge Berzon's dissent and Judges Pregerson's and Reinhardt's dissentals obsess about the discomfort Lopez might suffer during his execution, but say not a word about the incomparable suffering the victim endured during the last desperate minutes of her life.

The dissenters describe with zest Towery's execution, trying hard to make it sound like some sort of horror show. But, even if we accept the worst claims about that execution, it doesn't amount to a hill of beans. Towery was pricked several times in an earnest effort to find a vein that supports a catheter. This is an unpleasant experience routinely borne by many people who have deep-seated veins that aren't easily catheterized. See Anne Paxton, College of American Pathologists, "Sticking Points—How To Handle Difficult Blood Draws,"

http://goo.gl/PGYVJ (last visited May 16, 2012).

The procedure is unpleasant, to be sure, but no one—not even Lopez's advocates—claims it's excruciating. The most the dissenters can drag out of the record are mushy phrases such as "great pain," "severe pain" and "serious pain." See Reinhardt dissental at 3, 4; Lopez v. Brewer, No. 12-16084, at 1, 10 (May 15, 2012) (Berzon, J., concurring in part and dissenting in part). That's how most people describe a bad headache. This level of pain simply does not rise to an Eighth Amendment violation. Towery's discomfort, even if it were replicated in Lopez's case, comes nowhere near true suffering, such as that endured by Estafana Holmes, who died more than a quarter-century ago after twenty-six knife wounds and multiple lacerations; being beaten, raped, sodomized and degraded; and shedding liters of blood as she struggled in vain to save her life. See Lopez, 857 P.2d at 1265. Estafana had no chance to call her lawyer; there were no witnesses to her agony; she did not get to say farewell to her loved ones; she was allowed no last meal or final statement; no Article III judges agonized over her ordeal. "The death-by-injection which [my colleagues] describe[] looks pretty desirable next to that." Callins v. Collins, 510 U.S. 1141, 1142 (1994) (Scalia, J., wisely concurring in the denial of certiorari).

Lopez is, of course, entitled to a humane execution; the state may not subject

him to "an objectively intolerable risk of harm." <u>Baze</u> v. <u>Rees</u>, 553 U.S. 35, 50 (2008) (plurality op.) (internal quotation marks omitted). But the risk of some pain and discomfort, resulting from the subject's own physiology, is not intolerable. Many medical procedures cause pain and discomfort, sometimes severe: tooth extraction; rabies vaccinations; knee surgery; skin grafts; cystoscopies, to name just a few. People endure these nonetheless as part of ordinary human existence. An execution need not be totally painless, nor is the state required to go to extraordinary lengths to avoid the possibility that the condemned criminal will suffer some pain incident to procedures designed to carry out his lawful sentence. <u>See</u> <u>id.</u>

Lopez has presented no evidence that his execution will involve "an objectively intolerable risk of serious harm." <u>Id.</u> (internal quotation marks omitted). Absent such evidence, I don't see where he has raised a viable Eighth Amendment claim or any basis for enjoining his long delayed and richly deserved execution.

*Lopez v. Brewer*, No. 12-16084
BERZON, Circuit Judge, concurring in part and dissenting in part:

We find ourselves once again ruling on life and death issues on the eve of an execution. And once again, these issues arise on an appeal of the denial of an emergency motion for a stay of execution sought on the basis that the lethal injection mode of execution as the state will administer it will create such a substantial risk of serious pain as to violate the Eighth Amendment. *See Towery v. Brewer*, 672 F.3d 650 (9th Cir. 2012); *Beaty v. Brewer*, 649 F.3d 1071 (9th Cir. 2011); *Landrigan v. Brewer*, 625 F.3d 1144 (9th Cir. 2010), *vacated by* 131 S. Ct. 445 (2010).

In this instance, I cannot help but concur in the majority's conclusion that Lopez has not *at this point in the litigation* demonstrated the requisite "serious question" as to whether that his execution will violate the Eighth Amendment if allowed to proceed. I also concur in most of the majority's reasoning. In particular, Lopez has not proven that during the Towery execution, the pain suffered by Towery—for there assuredly was considerable pain, as the majority's account of the hour-long difficulty in setting IV lines illustrates—was sufficiently severe to meet the high standard the Supreme Court has set for finding an Eighth Amendment violation in carrying out an execution. *See Baze v. Rees*, 553 U.S. 35,

1

50 (2008). Without that proof, Lopez cannot project that he will be exposed to the risk of similar treatment, and therefore to a risk of harm so great as to constitute cruel and unusual punishment. Moreover, given the exceedingly short time before his execution, it will be impossible for Lopez ever to so prove, even if Towery did in fact suffer cruel and unusual punishment, or to avoid similar unconstitutional punishment for himself.

For me, unlike for the majority, that failure of proof cannot be the end of the story in this preliminary injunction appeal. It is far from clear to me that, were there the opportunity for this litigation to proceed in the ordinary course—that is, through full discovery—the requisite proof will not be available. And I lay the blame for present state of this litigation at the feet of the State.

In my view, Arizona has through its approach to devising, announcing, and recording the execution procedures it uses effectively denied Lopez of his procedural due process right to have his Eighth Amendment challenge heard at a meaningful time in a meaningful manner. It has done so by (1) granting the Director immense discretion in determining crucial aspects of the execution procedure rather than explaining in advance in any detail how the execution will be carried out; (2) ensuring that the important phases of executions are carried out behind closed doors; and (3) providing little information after-the-fact to the

2

public, and to inmates awaiting execution and their lawyers as to the details of recent executions, including information as to the causes and impact of difficulties such those encountered during Towery's execution—difficulties that, for all we now know, *might* be "sure or very likely to cause . . . needless suffering," *Baze*, 553 U.S. at 50, and might indeed have caused Towery such suffering.

1.  As we recounted in the last appeal in this case: Although "the procedures for [carrying out the death] penalty must be implemented in a reasoned, deliberate, and constitutional manner[, o]ver time, the State of Arizona . . . has insisted on amending its execution protocol on an ad hoc basis—through add-on practices, trial court representations and acknowledgments, and last minute written amendments—leaving the courts with a rolling protocol that forces us to engage with serious constitutional questions and complicated factual issues in the waning hours before executions." *Towery*, 672 F.3d at 653.  "This approach cannot continue," we warned. *Id.*

But it has.  Just as Arizona chose not to follow the protocol we upheld in *Dickens v. Brewer*, 631 F.3d 1139 (9th Cir. 2011), instead amending its protocol by watering down to vagaries and assertions of directorial discretion its core protections, so it has backtracked on some of the assurances provided us by counsel during the first appeal in this case.  In ruling on Moorman and Towery's

3

emergency motions for stays, we relied on the State's representations made during oral argument regarding both the qualifications of the IV Team and access to counsel. *Towery*, 672 F.3d at 658. We viewed these representations as binding on the State, and explicitly conditioned our holding on them. *Id*. Now we are told that the access to counsel has been cut back from what we approved, that any in-person contact with counsel the day of the execution is available only at the Director of the Arizona Department of Corrections' ("Director") discretion, and that although the expectation is that the IV Team for Lopez's execution will again consist of a doctor and a nurse, the Director has no obligation to assure that such medically qualified personnel are available and may not do so in the future.

The upshot is that Lopez, and others facing execution in the future, are not presented with any written, binding protocol such as the ones in *Baze* and in *Dickens* on which to focus in determining whether their impending execution will meet constitutional standards. Instead, the information they are provided consists largely of last-minute representations by counsel for the Director as to how the Director expects to carry out the immediately impending execution.

This mode of proceeding is particularly problematic here because, in my view, the January, 2012 protocol is probably unconstitutional as written in significant respects. We never reached the question in the previous appeal of the

constitutionality of the written protocol , and the majority does not reach it here, because the last minute representations made by counsel filled in the likely constitutional gaps with for-this-execution-only promises concerning how the Director was prepared to constrain his declared discretion.  But on the issue of the IV Team's qualifications and training and of the issue of access to counsel, the written protocol appears to me both to "create[] a demonstrated risk of severe pain" *Baze*, 553 U.S. at 61, and to sanction the possibility of an unconstitutional denial of the right to counsel.

For example, where the protocol approved in *Dickens* required that IV Team members be "medically trained," Arizona's January, 2012 protocol now requires only that the individuals inserting peripheral  IV lines  be "appropriately trained. " Where the earlier protocol  required that IV Team members have "current and relevant professional experience," it now requires only "one year of relevant experience," which could have been in the distant past.  *Towery*, 672 F.3d at 654. In the Arizona executions reviewed in  *West v. Brewer*, for instance, the IV setting in the challenged executions were carried out by a correctional officer who hadn't set an IV line in 15 years and had no specific recollection of the military training in which he was taught this procedure.  2011 WL 6724628, at *6 (D. Ariz. Dec. 21, 2011).

5

These concerns are only heightened by the protocol's equally watered-down training requirements. The protocol we approved in *Dickens* required that the IV Team members "responsible for inserting the IVs" must participate in "at least ten rehearsals per year." 631 F.3d at 1143. The 2012 protocol requires only "one training session . . . within one day prior to a scheduled execution." *Towery*, 672 F.3d at 655. These standards are so lax as to both qualifications and training that they may well create a significant *risk* that the team that is assembled in any given execution will be incompetent to carry out the execution without causing severe pain.

In addition to permitting the Director to assemble an incompetent IV Team, the 2012 protocol also permits the Director to restrict beyond the bounds permitted by the Constitution an inmate's right to counsel in the final hours before he is to be executed. Arizona's practice under earlier protocols had been to permit non-contact visits by both attorneys and a facility chaplain the morning of the execution, in many instances up until 45 minutes before the scheduled time of execution. *Id.* at 658. The 2012 protocol, however, grants the Director the discretion to forbid attorney visits—but not the visits the facility chaplain—after 9 p.m. the night before an execution. *Id.* at 655.

The constitutional right of access to the courts includes the right to in-person

6

visits with counsel. *Ching v. Lewis*, 895 F.2d 608, 610 (9th Cir. 1990). That right cannot be restricted without some legitimate penal justification. *Id.*; *see also Turner v. Safley*, 482 U.S. 78, 89 (1987). The state has to this point offered none. While it has suggested that allowing attorney visits in accordance with the old protocol could cause delays, Moorman's execution, to cite just one example, proceeded in a timely manner despite his meeting with his attorney up until 9:15 a.m. The state's interest in maintaining the confidentiality of IV Team members also cannot justify this restriction, as facility chaplains are assured access on the morning of the execution under the new protocol; presumably, chaplains are as observant as lawyers regarding who is present at the site of the execution. Moreover, the attorneys for condemned prisoners in Arizona have been required to agree to confidentiality regarding the identity of the individuals preparing to carry out the execution before obtaining access to their clients and have done so—without, as far as the record shows, any breaches in confidentiality. The upshot is that neither the delay concern nor the confidentiality rationale rests on any factual basis in the present record.

2. Despite these apparent deficiencies in the governing protocol, it is impossible at this juncture to say with the requisite degree of assurance whether the particular procedures that will be used to execute Lopez will create a

7

"substantial risk of serious harm." *Towery*, 672 F.3d at 653 (quoting *Baze*, 553 U.S. at 49–50). This uncertainty is not due to any failing on the part of Lopez or his attorneys. Instead, by continually making representations at the last minute regarding self-imposed, but transient, limitations on the broad discretion accorded by the protocol, the Director has both precluded the affected inmates from litigating the risk of serious harm created by the protocol itself *and* cabined those inmates' ability to litigate fully, after the usual discovery and opportunity to obtain expert testimony and other evidence, the actual circumstances of their own executions, and to do so in advance of the day they will be put to death. Their attorneys have been relegated to repeated, exhausting, preliminary injunction eve-of-execution challenges to the constantly moving target that Arizona's practices have created. Such challenges necessarily proceed on truncated records, and appeals are limited by the abuse-of-discretion standard. *Lands Council v. McNair*, 537 F.3d 981, 986 (9th Cir. 2008) (en banc).

Moreover, other aspects of the manner in which Arizona has been carrying out its now-frequent executions—there have been three in the last four months—further stymie any meaningful ability of condemned prisoners to litigate before they are put to death the constitutionality of the procedures that will be used to execute them. Aside from challenging the written protocol on its face, another

8

way condemned prisoners can attempt to demonstrate the likely impact of the procedures that will be used during their execution is to demonstrate that past executions carried out in accord with similar procedures have resulted in executions that violated the Eighth Amendment. But that approach can succeed only if there is detailed information available concerning past executions carried out with similar procedures.

Arizona puts impenetrable roadblocks in the way of obtaining such information in time to use it before a condemned prisoner is executed. First, the state insists upon extreme secrecy in carrying out executions. Witnesses are allowed only at the very end of the lethal injection process, during the actual administration of the lethal drugs after the IV lines have been set and the drugs concocted and readied for administration. Most of what can go wrong will go wrong *before* the small part of the execution process exposed to public view.

We have held that the First Amendment requires broader public access to the process of carrying out executions—which are, after all, carried out as a result of public decisions, in implementation of a controversial public policy. *See California First Amendment Coalition v. Woodford*, 299 F.3d 868 (9th Cir. 2002). There has been no First Amendment challenge of which I am aware to Arizona's contrary practice, and I am not suggesting that we should hold the practice

9

unconstitutional on that basis at this juncture. But the fact that California and other states, *see* Ohio Execution Policy 01-COM-11, § IV.G.4, have carried out their executions in full view suggests one way in which Arizona could provide a fair opportunity to challenge future executions conducted similarly—namely, by exposing to the public the actual impact of the procedures used and thereby permitting exposure through media and witnesses of any indications of serious pain during those executions.

Second, as the majority opinion describes, Arizona has recently increased the secrecy with which it conducts executions in another way: Although it used to keep detailed logs concerning what occurred during executions, its recent logs have been summary and perfunctory, making them useless for the purpose of discovering why whatever went wrong went wrong, and what was the impact on the prisoner being executed. One can only surmise that the reason for this change was to make it more difficult for condemned prisoners to litigate the nature of the risk created by the procedures used in the past; no other reason for recording less about the execution process than was done before comes to mind.

Third, as the majority opinion also describes, Arizona makes sure that the prisoners about to be executed cannot themselves describe any pain they suffered or mistakes made during the execution, by threatening to cut off their last statement

10

if they do so. According to the undisputed record in this case, inmates have been told that their microphones will be cut off if they make statements critical of the Arizona Department of Corrections. In an attempt to adjust to this edict, Towery and his lawyer developed a code by which Towery indicated that he sought access to counsel during the setting of the IV lines and was denied, and may have indicated that the execution procedures had caused him pain.

Finally, in a recent letter to Director Charles Ryan, Lopez's lawyers, who also represent the other plaintiffs in this lawsuit, have requested that they be permitted to observe the pre-execution process or observe videotapes of it. With appropriate assurances of confidentiality as to the identity of the individuals participating in the execution, such a procedure could provide a measure of procedural due process to other plaintiffs, if not to Lopez, by allowing some meaningful access to essential information that the state refuses otherwise to provide. But the request has not been granted.

These secrecy restrictions and refusals of public and attorney access, taken together, leave condemned prisoners, their attorneys, the district court, and this court with precious little indication of whether past executions have actually been conducted in a constitutional manner. The condemned clients, without access to their attorneys, are left to communicate with them in elaborate codes during their

11

last statements, while we are left to parse cryptic execution logs and autopsy reports in an effort to determine whether an inmate suffered pain, and if so, how much.

The trouble that plagued Towery's execution highlights the practical problems this obsessive secrecy creates for any meaningful litigation in the constricted time periods permitted by Arizona's moving target approach to execution procedures. After approximately half an hour trying to site a functioning catheter, the Director decided, for reasons unknown, to contact the Attorney General's office and provide "an update regarding the IV process." So the Director had access to counsel during the execution, although Towery—despite asking for such access at some point—did not. After 50 minutes—just 10 minutes short of the hour time limit allotted for this task under the protocol reviewed in *Baze*, 553 U.S. at 55—a femoral catheter had finally been placed. Only 59 minutes into the execution did the IV team succeed in placing a backup line (in a location known to create a danger of pain if used to administer drugs, so the backup line was either useless or possibly unconstitutional). An autopsy showed that Towery's arms had been pierced several times, and that his femoral artery had been pierced as well.[1]

---

[1] The record establishes that administering pentobarbital into the femoral artery rather than the vein can be very painful.

12

This entire process was conducted behind closed doors and, as the majority notes, recorded in only the most general of notes. Because of the secrecy, we have no way of knowing the degree of pain caused Towery; for all we know, it reached the standard for unconstitutional punishment set in *Baze*. It is possible that discovery during the course of this lawsuit could establish, through expert evidence and depositions of those present that it did – but by then, Lopez will be long dead, as, in all likelihood, will be some or all of the remaining plaintiffs. None of the executed individuals will have had a fair chance to litigate the constitutionality of the procedures applied to them during their execution.

To my mind, this *combination* of circumstances, not any one of them—the last minute changes in protocols; the even more last minute attestations to limitations on the Director's discretion for individual executions; the lack of access of the public and counsel to the pre-execution procedures; the failure to record in any detail what occurs during executions; and the restrictions on any reports by the condemned prisoners themselves of pain encountered during the execution process—amounts to a procedural due process violation. Lopez clearly has a liberty interest in avoiding a mode of execution that constitutes cruel and unusual punishment. *See Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003). The events that took place during the Towery execution demonstrate that there is at

13

least some risk that Lopez will be subjected to such an unconstitutional execution. Yet, Lopez has effectively been denied his right to be heard in a meaningful manner before he dies concerning the constitutionality of the processes that will be used to execute him. And this due process problem is not intractable; it could be solved in a variety of ways, including (1) providing a detailed written protocol that restricts the Director's discretion and is actually followed in executions; (2) keeping and making available detailed accounts of the actual execution processes, including any evidence of the impact on the pain perception by those executed; (3) providing either for public access or for more limited access by counsel to the pre-execution proceedings.

"[P]rocedural due process rules are shaped by the risk of error inherent in the truth-finding process." *Matthews v. Eldridge*, 424 U.S. 319, 344 (1976). Here, the risk of error is enormous. There is no redo, and the result of the constitutional error, if it occurs, will be severe pain, or, at least, a high likelihood of suffering such pain. Without at least one of the protections I have indicated, the plaintiff will be dead before it is possible to have a hearing as to the constitutionality of his execution that even approximates the access to the relevant facts ordinarily accorded litigants. And the absence of these protections is the result of Arizona's choices, in several instances the choice to cut back on procedural protections

14

previously accorded.

Executing someone convicted of a capital crime is a grim endeavor. Reviewing the details of impending executions to assure against unconstitutional executions is grim as well, a task judges would rather avoid. Yet, while we as judges cannot and should not micromanage executions, we do have an obligation to stand as a last bulwark against excessively painful administrations of the death penalty. To do that, we need to be presented with the relevant facts, gathered in some feasible fashion. As matters now stand, Arizona has made the gathering of such facts by condemned prisoners so difficult that meaningful judicial consideration at a relevant time is not possible. By doing so, Arizona has denied Lopez, and others awaiting execution in Arizona, due process of law. I would stay Lopez's execution until this denial of due process is corrected by one or more of the means I have indicated.[2]

---

[2]Given the press of time under which we have operated in this case, I may wish to further explain my views on this matter at a later date.

15

*Lopez v. Brewer*, No. 12-16084

PREGERSON, Circuit Judge, with whom Judges REINHARDT, WARDLAW, W. FLETCHER, and PAEZ, join, dissenting from the denial of rehearing en banc:

The State of Arizona continues to ignore this court's frequent requests to adopt a clear protocol stating the procedures it follows when executing its citizens. *See Towery v. Brewer*, 672 F.3d 650 (9th Cir. 2012)

As Judge Berzon reminds us in her partial dissent concerning the execution of Samuel Lopez, the simple fact remains that this court, the public, defense counsel, and inmates awaiting execution lack a definite understanding of the procedures and protocols the State of Arizona follows in executing its citizens. Because Arizona: (1) does not make known a detailed, written protocol; (2) limits the ability of counsel or witnesses to observe critical stages of the execution process; and (3) restricts its documentation of executions—prisoners awaiting execution and their defense counsel are prevented from obtaining information that could support a successful constitutional challenge to Arizona's use of lethal injection to execute death row prisoners.

The March 8, 2012 execution of Robert Towery is perhaps the starkest example of Arizona's flawed procedures. During that execution, Towery remained strapped to the execution table for more than an hour while execution team

-1-

members repeatedly poked and prodded him in an effort to set up both a primary and back-up IV line.

According to the Arizona Department of Corrections' ("ADC") log notes, at 9:49 a.m., Towery was restrained and secured to the execution table. At 9:52 a.m., the ADC Director specified the locations for the catheter sites. Towery remained strapped to the table for over thirty minutes, while the execution team made "multiple attempts" to insert left and right peripheral catheter IV lines. These attempts were unsuccessful. At 10:28 a.m., after these failed attempts, the IV Team Leader recommended a right femoral catheter as the primary IV line. This procedure required the use of a larger needle, a scalpel, and a "guide wire" to thread the needle into Towery's central femoral line.

According to the ADC log notes, the implementation of the central femoral line was completed at 10:50 a.m., nearly a full hour after the execution team began its work. At 10:59 a.m., a catheter was placed in Towery's right hand. Finally, at 11:17 a.m. Towery's execution began. Towery's autopsy revealed that both his femoral artery and femoral vein were punctured during the insertion of the IVs.

Because Towery is dead, we do not know how much pain he suffered during the hour that he was strapped to the execution table. What we do know, however, comes from his attorney, Dale Baich. Before his execution, Towery was told by

officials from the ADC that if he made any remarks during his "last statement" that were critical of the ADC, his microphone would be cut off. So Towery and his attorney devised a "code" system for Towery to communicate to his attorney if he experienced pain during his execution or was denied access to counsel. Under this code system, if Towery was denied access to his counsel, he would say during his last statement, "Hey Dale I should have called you." If there were problems with the insertion of the IV lines, or if Towery suffered pain during the insertion of the IV lines, he would utter the word "mistake" as part of his last statement. During Towery's last words, he said, "In the end, I should have called you Dale." Towery also said that he had made **"mistake, after mistake, after mistake."** (emphasis added).

Another example of cruel and unusual punishment involved the execution of Arizona prisoner Thomas Arnold Kemp on April 25, 2012. Instead of receiving the traditional three drug lethal injection mixture, Kemp was executed using only an injection of pentobarbital. Soon after receiving the lethal injection in his central femoral line, Kemp's right arm and torso began shaking "violently." In the district court, the State of Arizona argued that Kemp's execution took place "without incident," but the district court recognized that these words disregarded an eyewitness statement that Kemp convulsed for at least five seconds. Dr. Eric Katz

-3-

stated in a declaration that this description "suggests a partial seizure which began shortly after medication administration." An autopsy report revealed that despite Kemp's good veins that were quite prominent, Kemp had "at least three or more" punctures, including "at least one puncture in the right femoral area and at least two punctures over the left upper extremity."

Justice and logic compel the conclusion that clearly defined, written protocols are required when the state determines that it will execute one of its inmates. How would the public – prohibited from attending Arizona's executions – know that an execution was carried out consistent with Constitutional requirements without the disclosure of a written protocol? And how could a reviewing court be confident that Arizona is following constitutional procedures when taking the life of one of its citizens?

This court is not alone in its insistence that states who perform executions maintain a proper and consistent written protocol system. *See Taylor v. Crawford*, 457 F.3d 902 (8th Cir. 2006) (upholding the district court in directing the Missouri Department of Corrections to adopt a revised written protocol for lethal injections in Missouri, in light of the fact that the majority of the protocol was unwritten); *Clemons v. Crawford*, 585 F.3d 1119, 1122-23 (8th Cir. 2009) (summarizing the procedural and factual history of *Taylor v. Crawford*).

I would grant Samuel Lopez a stay of execution. The State of Arizona must comport with the requirements of due process of law and establish a **clear** and humane protocol that gives the public, this court, and most importantly, inmates and their defense counsel, notice of its execution procedures.

Arizona has stubbornly refused to define the amorphous and highly discretionary protocol it follows in executing its citizens. Until the state adopts a clearly written and humane execution protocol there exists a substantial risk that the constitutional rights of those it executes will be violated. Accordingly, I dissent.[1]

---

[1] Chief Judge Kozinski tells us that there can be no Eighth Amendment violation in this case because any pain that Lopez would suffer "pales in comparison" to the pain he inflicted upon the woman he murdered. Concurrence at 2. I agree with Chief Judge Kozinski that Lopez's crime was senseless, brutal, horrible, and tragic. But I disagree with the proposition that the pain and horror inflicted upon a murder victim is relevant in determining whether the state's method of execution constitutes "cruel and unusual punishment" in violation of the Eighth Amendment. To accept this proposition would allow the state to turn the place of execution into a torture chamber. The Supreme Court has instructed that the Eighth Amendment requires courts to look to "evolving standards of decency." *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008). There is nothing "decent" about what Lopez did to his victim. Such behavior should not be replicated.



*Lopez v. Brewer*, No. 12-16084

REINHARDT, Circuit Judge, with whom Judges PREGERSON, WARDLAW, W. FLETCHER, FISHER, PAEZ, and BERZON join, dissenting from the denial of rehearing en banc:

On multiple occasions in recent months, the State of Arizona has subjected prisoners whose lives it takes—and has subjected this court—to a mockery of the constitutional requirement of due process. In the case of Jeffrey Landrigan, the state announced days before the execution that it planned to use a foreign-source drug and refused "to comply with the district court's orders to provide . . . critical information about the provenance and efficacy of the" drug. *Landrigan v. Brewer*, 625 F.3d 1132, 1133 (9th Cir. 2010) (Wardlaw & W. Fletcher, JJ., concurring in the denial of rehearing en banc). In the case of Donald Beaty, the state announced *eighteen hours* before the execution that it intended to switch to the use of a drug that it had never tested and in the use of which it had never trained its executioners. *Beaty v. Brewer*, 649 F.3d 1071, 1072 (9th Cir. 2011) (Reinhardt, J., dissenting from the denial of rehearing en banc). In the cases of Robert Towery and Robert Moormann, the state changed its written execution protocol at the last minute, then changed course yet again, informing the court just hours before argument that it was switching the method of execution "because it discovered at the last minute that the originally-planned drugs

-1-

had expired" a month before. *Towery v. Brewer*, 672 F.3d 650, 652-53 (9th Cir. 2012). In case after case, we have been forced to rely on the ad hoc representations of the state's counsel in conducting one of the gravest responsibilities that we are asked to perform: approving the state's plan to take a human life. *See, e.g.*, *West v. Brewer*, 652 F.3d 1060, 1060-61 (9th Cir. 2011). Over and over again, judges of this court have told the state that its cavalier defiance of due process must end. *See Landrigan*, 625 F.3d at 1133 (Wardlaw & W. Fletcher, JJ., concurring in the denial of rehearing en banc) ("The State's gamesmanship is unseemly at best, and inhumane at worst."); *Beaty*, 649 F.3d at 1072-73 (Reinhardt, J., dissenting from the denial of rehearing en banc) ("The state's last-minute action serves, whether by design or otherwise, to deprive a capital defendant of a fair opportunity to contest the constitutionality of the new method of death to be used."); *Towery*, 672 F.3d at 653 ("Over time, the State of Arizona . . . has insisted on amending its execution protocol on an ad hoc basis—through add-on practices, trial court representations and acknowledgments, and last minute written amendments—leaving the courts with a rolling protocol that forces us to engage with serious constitutional questions and complicated factual issues in the waning hours before executions. This approach cannot continue."). The state either has not heard the message or it has ignored it. It's hard to believe that it could be the former.

-2-

As Judge Berzon thoroughly explains in her partial dissent from the panel's refusal to stay the execution of Samuel Lopez, the state's mockery of due process goes far beyond the mere fact of repeated and last-minute changes. The state has systemically frustrated this court's ability to determine the constitutionality of its execution procedures by 1) refusing to codify those procedures in a detailed, written protocol; 2) limiting the ability of counsel or witnesses to observe critical parts of the execution process, particularly the setting of intravenous lines; and 3) restricting its documentation of executions so that little useful information is available to counsel, and to prisoners awaiting execution, even after the fact. I have nothing to add to Judge Berzon's bill of indictment against the state except the observation that if a skilled lawyer were instructing the state on how best to avoid *any* meaningful review of the constitutionality of its execution procedures, he would be hard pressed to improve on the unconscionable regime that the state has adopted.

Let me close simply by reciting the facts of Robert Towery's execution, as they are recounted in Judge Berzon's opinion. Fifty minutes elapsed before the execution team managed to place a primary line in Towery's groin. While the line should have been placed in Towery's femoral vein, an autopsy later showed that his femoral *artery* was pierced; the record shows that the administration of the execution drug into the femoral artery can cause great pain. It took the team *fifty-nine* minutes—just one

minute short of the one-hour limit approved in the *Baze* safe-harbor protocol, *Baze v. Rees*, 553 U.S. 35, 55 (2008)—to set a backup line. When that line was finally placed, it was in Towery's hand, even though the state's own doctor once testified that the administration of the execution drug through the vein in a prisoner's hand can cause pain. During this prolonged ordeal, the Director of the Department of Corrections contacted the state Attorney General's office. Towery, too, apparently sought to contact his lawyers, but the state refused his request. That brings us to the most chilling part of this story: the only reason we even know that Towery asked to speak with his lawyer is that he communicated that fact *in code* while speaking his last words. Why in code? Because, "[a]ccording to the undisputed record in this case, inmates have been told that their microphones will be cut off if they make statements critical of the Arizona Department of Corrections." Berzon Dissent at 11. As a result, not only was Towery denied his right to counsel; Lopez and all prisoners whom the state may seek to execute in the future were denied their rights to litigate meaningfully whether they, too, may suffer severe pain during the execution process. This is not due process. It is barely even process at all.

If we are to continue the state-sanctioned killing of prisoners, in the United States in 2012, we must find a better way than Arizona's. The majority's hollow warning to the state that "Arizona's ad hoc approach risks going beyond" what is

constitutional can only inspire chuckles in the Arizona Attorney General's and Governor's offices. By now they must know how feeble the authority of this court is in death penalty cases, at least as we have interpreted it, and how unwilling the Supreme Court is to enforce the Eighth Amendment. For that reason this dissent is likely as pointless as the majority opinion and its futile reminder of our pointless repeated remonstrances to the state. Next time Arizona flouts the Constitution, we might as well remain silent and not continue to pretend that it matters what we say—unless we are willing to take action rather than simply shed more futile tears.